MYERS, J.,
for the Court:
¶ 1. Amy Madden was indicted by a Forrest County grand jury on Count I, sexual battery upon her daughter, Jane Doe,[1] “between on or about December 25, 2007, through April 25, 2008,” by engaging in the act of sexual penetration, “to wit: by placing an unknown object into her anus[,]” and on Count II, child neglect for feloniously permitting Scott Conley, Jane’s father, to physically and sexually abuse Jane, continuously, “between on or about December 25, 2007, through April 25, 2008[.]”
¶ 2. Madden was convicted by a jury sitting before the Forrest County Circuit Court of sexual battery and felony child neglect. On Count I, the trial court sentenced Madden to twenty years in the Mississippi Department of Corrections (MDOC), with eight years to serve, twelve years suspended, and five years of post-release supervision. On Count II, the trial court sentenced Madden to eight years in the custody of the MDOC. The trial court *1220 ordered both counts to run concurrently with one another.
¶ 8. Because we find that Conley’s guilty plea to sexual battery upon Jane was used as evidence to indicate Madden’s guilt at trial and because the trial court failed to comply fully with Rule 803(25) of the Mississippi Rules of Evidence, we reverse the judgment of Madden’s convictions and sentences and remand this case to the trial court for a new trial in accordance with this ruling.
FACTS
¶ 4. On April 25, 2008, Madden was involved in a minor traffic accident in Petal, Mississippi. She was subsequently arrested and charged with misdemeanor driving under the influence (DUI). Madden’s two daughters, Jane, age three, and Ashley Doe, twenty-one months, were with Madden in the car at the time. No one was injured as a result of the accident, but both children reportedly had a dirty and unkempt appearance about them. So authorities transported the children to Forrest General Hospital in Hattiesburg, Mississippi, and contacted the Mississippi Department of Human Services (DHS). That evening, DHS had the children placed in the care of licensed foster parents, Sue and John Smith.
¶ 5. Approximately one week later, Jane reportedly began exhibiting inappropriate behavior while at the Smiths’ home. According to Sue, the first incident occurred while she and her eleven-year-old daughter were dressing Jane and Ashley after the children’s bath. Sue’s daughter said: “Momma, [Jane] is sticking this toy up her bootie.” Sue stopped Jane and asked her why she was doing that. Jane replied, “Seottie, my daddy, did this to me.” Sue questioned Jane further, and Jane said, “My daddy, Seottie, sticks his finger in me.” Sue told the jury that when Jane first arrived at their home, Jane’s bottom was “very raw,” a condition which Sue thought odd at the time because Jane was already potty trained and did not wear diapers. Jane had been prescribed medication for her condition, so Sue asked Jane if her daddy had stuck his finger in her to apply medication. Jane replied: “No. You don’t understand. He sticks his finger up me.” Jane then inserted her finger into her vagina.
¶ 6. Sue called Andrea Thornton at DHS. Thornton set up a forensic interview at a child advocacy center, which was conducted on May 7, 2008. Thornton, who testified on behalf of the State at trial, testified that the findings of that interview were inconclusive due to Jane’s inability to sit still during the interview. Thornton thereafter referred Jane for counseling at the Shafer Center for Crisis Intervention in Hattiesburg, Mississippi, a private, nonprofit organization that helps victims of sexual violence and other traumatic experiences. Jane’s first visit to the Shafer Center occurred on June 17, 2008.
¶ 7. On May 21, 2008, Jane underwent a forensic medical examination at the “Children’s Justice Center.” Dr. Kathy Kolar, who has a Ph.D. in nursing research, conducted the examination. Dr. Kolar testified on behalf of the State at trial and stated that Jane’s “genitalia were within normal limits.” Dr. Kolar also stated that in her opinion, the medical exam neither confirmed nor denied that sexual abuse had taken place.
¶ 8. Jane reportedly continued to exhibit inappropriate behavior while at the Smiths’ home, and she began to tell Sue more things. According to Sue, Jane told her a number of times that her mother had stuck a purple stick in her and that she would do the same to her mother. Jane said the object hurt her and made her bleed. Jane indicated the length of the *1221 object with her hands and said it made a “buzz, buzz noise, and that it moved back and forth.” Jane also reportedly said that her daddy has a tail and that he would “pee-pee way down in her mouth.” Jane then demonstrated the act with the use of her finger.
¶ 9. Sue said they had to keep a constant eye on Jane because she “was acting out sexually on herself on a daily basis,” and she would try to do so on Ashley and others.
¶ 10. Sue recalled one incident where Jane was playing with a child’s “light-up spoon.” Jane inserted the spoon into her mouth in a sexual motion and began making herself “gag.”
¶ 11. On June 17, Sue took Jane to the Shafer Center. There they met Shan Tér-rica Barnes, who would become Jane’s therapist. Barnes testified that she had been informed by Thornton prior to Jane’s first visit to the Shafer Center that there had been an allegation of possible sexual abuse, but no sexual abuse had been disclosed at a forensic interview previously conducted with Jane. Because no sexual abuse had been disclosed, Barnes said DHS only wanted the Shafer Center to conduct what the center calls, “psycho-education” with Jane, which involves educating “the caregiver and the children about sexual abuse, their body, good touch, [and] bad touch.”
¶ 12. Barnes said the June 17 meeting was intended as an informal intake-assessment session — the purpose of which was to gather some general background information on Jane. This, according to Barnes, is usually done with the child’s parent(s) or caregiver(s) outside the presence of the child. In this instance, however, Jane stayed with Sue during the meeting.
¶ 13. Barnes had Jane sit on the floor and color, while Barnes and Sue talked.
As Barnes and Sue were talking, Sue made a remark about “bath time,” at which point, Jane looked up and said, “Mommy stuck her finger in my bootie.” Barnes sat Jane on her lap and asked Jane to talk about bath time. Barnes related the following to the jury:
[Jane] told me, “[Ashley] has tits” .... Then she said, “I have tits.” Next she ... pulled down the top portion of her shirt to show me. [Jane] told me she had a belly button and at the same time she was pulling up her shirt showing me. I poked her belly button and she laughed. [Jane] then said she has, “Uh, uh.” And she was trying to pull her pants down, but she was sitting in my lap thus she could not get them down. I told her we are not to show our private parts to everybody. I asked [Jane] who could she show her privates to? She stated, “Mommy, daddy, and C.D.”
[[Image here]]
[Jane] stated, “Daddy called me bitch head.” [Jane] giggled during this conversation. [Jane] reported that she gets naked while mommy and daddy pull their pants down. I stated, “You get naked and mommy and daddy do, too?” [Jane’s] voice appeared to get loud and she said, “No. Mommy and daddy pull their pants down and I get naked.”
I stated, “Oh, you get naked and mommy and daddy pull their pants down?” She stated, ‘Yeah.”
I asked [Jane], “What does mommy’s private look like?”
She replied, “Like me.”
I asked [Jane], “What does daddy look like?”
[Jane] stated, “Shit, and I don’t like shit.”
Barnes said Jane then hopped from her lap and began jumping on the couch in the room, at which point Sue pulled a spoon *1222 from her purse. Jane took the spoon and tried to stick it in her pants. Jane then stuck the spoon in her mouth in an “oral motion,” and she began to “gag continuously.” Jane threw the spoon out and started gyrating and fell back on the couch. She then said, “I don’t like shit.... Daddy put shit in my mouth.”
¶ 14. Barnes testified that she stopped the meeting at that point because Jane had made a disclosure. Barnes told Sue that Jane could not come back to the Shafer Center until Jane had a forensic interview. Afterwards, Barnes contacted both DHS and the district attorney’s office.
¶ 15. Barnes did not see Jane again until July 21, 2008, which was when Jane began her therapy. Jane had seventeen therapy sessions- in total; the last one occurred in September 2009.
¶ 16. Jane reportedly told Barnes at the July 21 session that her mother had “stuck a stick in her bootie and it made her bleed ... [and] that mommy laughed.” Barnes said that Jane indicated that the stick was big; it moved; and it went, “Buzz. Buzz.”
¶ 17. Barnes said there were some therapy sessions where Jane either did not disclose any sexual abuse or she did not disclose anything new. At a session in September 2008, Jane reportedly said that “mommy licked her bootie.” Barnes asked Jane where her bootie was, and Jane first said, “I can’t show you.” Barnes asked Jane if she could point to it. Jane then pointed to her vaginal area. In November 2008, Jane reportedly told Barnes that “when mommy stuck the stick in her boo-tie, she licked her titty.” In December 2008, during “play therapy,” Jane reportedly picked up a toy microphone that was lying on the floor among other toys in the room and indicated to Barnes that the microphone was similar in size to the stick her mother had inserted inside her.
¶ 18. Other witnesses for the State included Venus Gray, a DHS supervisor; Dr. Lucille Rowley, a consultant to the Shafer Center; and Sue’s daughter-in-law.
¶ 19. A number of witnesses testified on Madden’s behalf during her case-in-chief, including Madden, herself. Madden emphatically denied having ever touched Jane inappropriately, and she denied having seen Conley do so either. Madden also denied ever seeing Jane behave in the manner attested to by the State’s witnesses. Madden claimed that from December 26, 2007, until shortly before DHS removed her children in April 2008, she and the two children had resided with Conley in a “40-foot alumilite camper” located in Lamar County, Mississippi. Madden said they moved from her mother’s home in Forrest County, Mississippi, the day after Christmas 2007.
PROCEDURAL HISTORY
¶ 20. Madden’s trial was held in May 2010. A month prior to trial, the trial court conducted a hearing to consider the State’s motions to declare Jane unavailable as a witness pursuant to Rule 804(a)(6) of the Mississippi Rules of Evidence and to declare statements made by Jane admissible pursuant to Rule 803(25).
¶ 21. Upon receiving expert testimony from Barnes, as an expert in marriage and family therapy, the trial court declared Jane unavailable to testify at Madden’s upcoming trial. The trial court found that there was a substantial likelihood that Jane’s emotional or psychological health would be substantially impaired if Jane were required to testify in the physical presence of Madden. See M.R.E. 804(a)(6). The trial court reserved its ruling on the admissibility of Jane’s out-of-court statements.
*1223 ¶ 22. The record indicates that on the morning of Madden’s trial, prior to voir dire, the trial court made an off-the-record ruling that Jane’s statements would be allowed into evidence. Madden’s counsel thereafter requested a continuing objection with respect to the trial court’s ruling, based on the ground that Jane’s statements constituted inadmissible hearsay. Counsel’s objection was entered on the record immediately preceding opening statements in the case.
¶ 23. During the State’s case-in-chief, the prosecution asked Thornton if she was present in the courtroom when Conley had pleaded guilty to sexual battery of Jane, specifically, to the charge of oral sex. Madden’s counsel objected on the ground of hearsay. Without issuing a definitive ruling, the trial court stated, “You’ve made your point, don’t you? [sic].”
¶ 24. According to the trial transcript, Barnes and Sue both remarked, during their respective cross-examinations, that they had heard that Conley had pleaded guilty to sexual battery of Jane. Conley did not testify at Madden’s trial.
¶25. During closing arguments, the prosecution stated: “We’ve got to show that [Madden], the mother of [Jane], allowed [Conley], the father, to sexually abuse her in her presence. How do we show that? You’ve heard the testimony that [Conley] has pled guilty.”
¶26. During another portion of the State’s closing arguments, the following was said:
All of you heard yesterday ... that [Conley] pled [guilty] to sexual assault and got a probated sentence. Now, frankly, that makes me sick. Makes me sick. But we make decisions to charge people and we make decisions in plea bargain situations based on a case — an individual ease. You may have two defendants. You may have three defendants. And the evidence to one defendant as opposed to another defendant may be different. The law may allow us to use a certain kind of evidence in one case and not in another case. And we make decisions. I hope as long as I’m here I’m going to make decision [sic] that are in the best interest of the victim. The victim in this case is a child.
¶ 27. The jury found Madden guilty of sexual battery and felony child abuse. Madden filed a post-trial motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial, in which she raised numerous issues. The trial court denied the motion, and this appeal followed.
¶ 28. As we are reversing and remanding this case back to the trial court for a new trial, we will only discuss those assignments of error we deem necessary for the disposition of this appeal.
DISCUSSION
I. WHETHER THE TRIAL COURT MISAPPLIED MISSISSIPPI’S TENDER-YEARS EXCEPTION TO HEARSAY INADMISSIBILITY.
II. WHETHER THE TRIAL COURT ERRED IN ALLOWING THE JURY TO HEAR THAT CONLEY HAD PLEADED GUILTY TO SEXUAL BATTERY OF JANE.
¶ 29. We address issues one and two together. Madden argues that the trial court failed to comply with Rule 803(25), commonly referred to as the tender-years exception. She contends that the rule’s prerequisite linchpin of reliability was absent from the underlying facts of the case, and she contends that the trial court failed to conduct an on-the-record analysis of the Wright factors set forth in *1224 the comment to the rule. Madden also argues that the trial court erred by allowing evidence of Conley’s guilty plea to go before the jury, as it constituted incompetent evidence and violated her Sixth Amendment confrontation rights.
¶30. Madden’s arguments challenge evidentiary rulings made by the trial court. This Court reviews such rulings under an abuse-of-discretion standard. Hall v. State, 785 So.2d 302, 304 (¶ 6) (Miss.Ct.App.2001). We will not reverse a trial court’s decision on the admissibility of testimony offered at trial unless prejudice amounting to reversible error resulted from the decision. Alexander v. State, 610 So.2d 320, 329 (Miss.1992).
¶ 31. Rule 803(25) provides the following:
A statement made by a child of tender years[2] describing any act of sexual contact performed with or on the child by another is admissible in evidence if: (a) the court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provided substantial indicia of reliability; and (b) the child either (1) testifies at the proceedings; or (2) is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act.
¶ 32. The comment to Rule 803(25) provides some factors, commonly called the Wright factors, that the trial court may consider in determining whether the statements) bear(s) a substantial indicia of reliability:
(1) whether there is an apparent motive on declarant’s part to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; (5) the timing of the declarations; (6) the relationship between the declarant and the witness; (7) the possibility of the declarant’s faulty recollection is remote; (8) certainty that the statements were made; (9) the credibility of the person testifying about the statements; (10) the age or maturity of the declarant; (11) whether suggestive techniques were used in eliciting the statement; and (12) whether the declar-ant’s age, knowledge, and experience make it unlikely that the declarant fabricated.
See also Idaho v. Wright, 497 U.S. 805, 822, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). This list of factors is neither exclusive nor exhaustive. Withers v. State, 907 So.2d 342, 350 (¶ 23) (Miss.2005). “There is no requirement that each factor be listed and discussed separately by the trial judge.” Bosarge v. State, 786 So.2d 426, 437 (¶ 32) (Miss.Ct.App.2001). “Rather, the unifying principle [underlying] these factors [is that they] relate to whether the child declarant was particularly likely to be telling the truth when the statement was made.” Wright, 497 U.S. at 822, 110 S.Ct. 3139. “[N]o mechanical test is available” for this determination. Eakes v. State, 665 So.2d 852, 865 (Miss.1995). In Klauk v. State, 940 So.2d 954, 956 (¶6) (Miss.Ct.App.2006), this Court stated:
While the notes to [Rule] 803(25) set out several factors, the judge should make an overall determination of the likelihood that these statements are true and make an on[-]the[-]record finding that there is substantial indicia of reliability. [Walls v. State, 928 So.2d 922, 927 (¶ 14) *1225 (Miss.Ct.App.2006) ] (citing Hennington v. State, 702 So.2d 403[, 415] (¶ 54) (Miss.1997)). Specifically, before admitting hearsay testimony, the trial court must rule on the factors detailed in Rule 803(25)(a) and (b). Veasley [v. State,] 735 So.2d [432, 437] (¶ 16) [ (Miss.1999) ].
(Internal quotations omitted). “Corroborating evidence may not be used as an indicia of reliability.” See M.R.E. 805(25) rant.
¶ 33. We find that the trial court complied with subpart (b) of Rule 803(25). As mentioned, the trial court heard evidence pertaining to the State’s motion to declare Jane unavailable to testify at trial. Although Madden objected to the State’s motion, she offered no countervailing evidence in response. Based on our review of the record, we find no abuse of discretion in the trial court’s decision to grant this part of the State’s motion.
¶ 34. The trial court failed, however, to comply with subpart (a) of Rule 803(25), which requires the court to find affirmatively “that the time, content, and circumstances of the statement provided substantial indicia of reliability.”
¶ 35. In Klauk, this Court held that the trial court’s failure to make an on-the-record factual determination as to whether the out-of-court statements of a minor, presumptively within tender years, contained substantial indicia of reliability, was error. See Klauk, 940 So.2d at 956 (¶ 6). We found the error harmless because we determined that the weight of the evidence against the defendant sufficiently outweighed the harm done. Id. at 956-57 (¶¶ 7-8).
¶ 36. Similar to Klauk, the record in the instant case contains no factual determination by the trial court as to the reliability of Jane’s statements. This constitutes error on the part of the trial court. Id. at 956 (¶ 6). But unlike in Klauk, we do not find the error before us is harmless.
¶ 37. The record manifestly shows that Conley’s guilty plea was used as evidence at trial in order to help establish Madden’s guilt on the felony child-abuse charge. The general rule in Mississippi is that where two or more persons are jointly indicted for the same offense, but tried separately, a judgment of conviction or a plea of guilty against one of them is not competent evidence on the trial of the other because such guilty plea or conviction is not evidence of the guilt of the party being tried. Robinson v. State, 465 So.2d 1065, 1068 (Miss.1985) (citing Henderson v. State, 403 So.2d 139, 140-41 (Miss.1981)).
¶ 38. In White v. State, 616 So.2d 304, 307 (Miss.1993), the Mississippi Supreme Court noted that “[f]ederal and state appellate courts have found the admission of a co-conspirator’s plea of guilty, while incompetent as substantive evidence of the defendant’s guilt, may be admissible for other purposes.” (Citing United States v. Medley, 913 F.2d 1248, 1257-58 (7th Cir.1990); United States v. Davis, 766 F.2d 1452, 1456 (10th Cir.1985); United States v. Wiesle, 542 F.2d 61, 62-63 (8th Cir. 1976); People v. Brunner, 797 P.2d 788, 789 (Colo.Ct.App.1990); State v. Padgett, 410 N.W.2d 143, 146 (N.D.1987); see also State v. Braxter, 568 A.2d 311, 316 (R.I.1990) (guilty plea of accomplice in trial of defendant on same charge admissible when introduced to impeach accomplice, but inadmissible to demonstrate guilt of defendant); State v. Rothwell, 308 N.C. 782, 303 S.E.2d 798, 800-01 (1983) (guilty plea of co-conspirator admissible when admitted for “legitimate purpose” but never as evidence of defendant’s guilt); Greer v. State, 188 Ga.App. 808, 374 S.E.2d 337, 338 (1988) (no error for admission of accomplice’s guilty plea to same crime which *1226 defendant is charged where the plea was introduced during the accomplice’s testimony and the accomplice was subject to cross-examination by defendant)).
¶39. White noted a distinction in this area between a conviction based on a jury verdict and one based on a guilty plea. The supreme court explained as follows:
The danger at issue in these cases is that one jury would rely upon the judgment of a prior jury in reaching its decision. These cases are distinguishable, however, because we are dealing with a plea of guilty in the instant case; that is, a prior admission of guilt, which is consistent with the testimony at trial. This is a significant distinction because prior statements have evidentiary value different from prior findings of other tribunals.
Moreover, whether an error in admitting this evidence is sufficiently prejudicial to warrant reversal may be resolved differently where the offending evidence is no more than a repetition of what is said by the witness before a jury and subject to cross[-]examination, as opposed to evidence of the collective judgment of another jury. Finally, where, as here, the issue of the witnesses] guilt is based on conduct not involving the defendant and not at issue in the trial where the witness testifies, the reason for the prohibition loses its force.
Buckley [v. State, 223 So.2d 524 (1969)] and [State v.] Thornhill[, 251 Miss. 718, 171 So.2d 308 (1965) ] involve guilty pleas. Thornhill, however, is easily distinguishable. There the [S]tate sought to introduce the record of conviction of two co-defendants without calling them as witnesses. Thornhill, 251 Miss. at 721, 726-27, 171 So.2d at 312. Obviously such evidence is inadmissible as the guilt or innocence of co-defendants does not per se bear upon the question of guilt of the person on trial. Moreover, the evidence was hearsay if offered to prove the truth of the matters asserted by the plea of guilt. [M.R.E.] 801(c) (Comment: This rule “codifies and simultaneously clarifies the common[-]law definition of hearsay.”) In Buckley, the witness was a co-indictee who testified.
White, 616 So.2d at 307 (emphasis added).
¶ 40. Significantly, Conley did not testify in this case. In Garrison v. State, 726 So.2d 1144, 1146 (¶ 7) (Miss.1998), the supreme court dealt with a case where the trial court had entered the transcript of a co-defendant’s guilty plea when the co-defendant refused to testify at the defendant’s trial. The supreme court reversed this Court’s finding that the trial court had properly admitted the transcript as an exception to the hearsay rule pursuant to Rule 804(b) and found that the admission violated the defendant’s Sixth Amendment confrontation rights. Id. at 1146 (¶ 8).
¶ 41. The State points out that Madden did not object on this ground and, thus, contends that she waived the right to assert it on appeal. Garrison, however, appears to hold otherwise, as the defendant in that case, similarly, had objected to the admission of the guilty-plea transcript based on hearsay grounds. See id. at (¶ 7).
¶ 42. Nevertheless, we find it unnecessary to reach Madden’s constitutional argument. Conley’s guilty plea, as evinced by the prosecution’s closing arguments, was used as evidence in the case to show that he had committed sexual battery upon Jane and to indicate Madden’s culpability in the act. The evidence constituted impermissible hearsay because it was offered to prove the truth of the matters asserted. See, e.g., White, 616 So.2d at 307. Madden preserved the issue for appeal by objecting on the ground of hearsay. For the rea *1227 sons just discussed, we find that the trial court erred by not sustaining her objection.
¶ 43. Further, as mentioned, Barnes and Sue both commented on the fact that Conley had pleaded guilty, and they both did so at critical points during their respective cross-examinations while defense counsel was probing their credibility and the credibility of some of Jane’s statements. Because Conley’s guilty plea was also allowed to serve as evidence in the trial, it very likely had the effect of bolstering Barnes’s and Sue’s credibility in front of the jury. This in turn might have mistakenly caused the jury to infer trustworthiness on some of Jane’s out-of-court statements based upon incompetent evidence.
¶ 44. We find that the admission of Conley’s guilty plea into evidence permeated Madden’s trial with obvious unfairness. Accordingly, we hold that Madden is entitled to a new trial where noncompliance with subpart (a) of Rule 803(25) and improper use of Conley’s guilty plea are unlikely to recur.
III. WHETHER THE ADMISSION OF JANE’S STATEMENTS TO BARNES VIOLATED MADDEN’S FUNDAMENTAL CONSTITUTIONAL RIGHT TO CONFRONT THE WITNESSES AGAINST HER.
¶ 45. Madden argues that the admission of Jane’s statements to Barnes violated her Sixth Amendment right to confront a witness against her under Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). Madden contends that because Barnes reported her findings to the district attorney’s office, Jane’s statements to Barnes became testimonial, as they were gathered for the purpose of being used in a future criminal proceeding.
¶ 46. Under the Sixth Amendment, a defendant in any criminal prosecution has the right to confront witnesses against him or her. U.S. Const, amend. VI (applicable to the states through U.S. Const, amend. XIV). Prior to Crawford, the United States Supreme Court had interpreted the Confrontation Clause to permit the states to use hearsay statements of a declarant who was not available at trial if the hearsay fell within “a firmly rooted hearsay exception” or if it otherwise bore “particularized guarantees of trustworthiness.” See, e.g., Ohio v. Roberts, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (overruled). In Crawford, however, the Supreme Court found that the interpretation of the Sixth Amendment in Roberts was inconsistent with the historical principles behind the Confrontation Clause. Crawford, 541 U.S. at 60, 124 S.Ct. 1354. Crawford held that the Sixth Amendment “commands, not that [hearsay] evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.” Id. at 61. Crawford stated that the principle behind the clause was that “[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.” Id. at 59. Crawford, thus, concluded that if the statement proffered is testimonial in nature, it must be subjected to cross-examination regardless of its reliability. Id. at 68.
¶47. In order for Crawford to apply to Jane’s statements as Madden contends in this appeal, we must necessarily find that Jane’s statements were testimonial. Bishop v. State, 982 So.2d 371, 374 (¶ 10) (Miss.2008). “Only [testimonial] statements ... cause the declarant to be a *1228 witness within the meaning of the Confrontation Clause.” Davis v. Washington, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). “Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law....” Crawford, 541 U.S. at 68,124 S.Ct. 1354.
¶ 48. Crawford declined to provide a comprehensive definition of “testimonial” evidence; rather, the Court noted possible formulations for testimonial statements, which includes “at a minimum ... prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and ... police interrogations.” Id. The Mississippi Supreme Court has concluded that “a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused.” Bishop, 982 So.2d at 375 (¶ 10) (quoting Hobgood v. State, 926 So.2d 847, 852 (¶ 11) (Miss.2006)).
¶ 49. In Williams v. State, 970 So.2d 727, 734 (¶ 22) (Miss.Ct.App.2007), this Court held that a videotaped forensic interview of a sexual-battery victim conducted at a non-profit, non-governmental entity, was testimonial in nature, as contemplated by Crawford, where a law-enforcement officer was present at the interview after having already gathered evidence in the case by recording phone conversations between the victim and the defendant. (Citing T.P. v. State, 911 So.2d 1117, 1123 (Ala.Crim.App.2004); Snowden v. State, 156 Md.App. 139, 846 A.2d 36 (Md.Ct.Spec.App.2004)). We, however, found the erroneous admission of this evidence harmless because the defendant had the opportunity to cross-examine the victim at trial about her statements on the videotape. Id. at (¶ 23).
¶ 50. Relying on Williams, and the two cases cited therein, T.P. and Snowden, Madden argues that Jane’s statements to Barnes were testimonial because even though Barnes’s interviews with Jane occurred at a non-governmental entity, they nonetheless arose from a referral by DHS while in the process of investigating an allegation of child-sexual abuse.
¶ 51. We find the circumstances surrounding Jane’s statements to Barnes distinctly different from those found in Williams, as well as in T.P. and Snowden. The interview in Williams was found to be the functional equivalent of a police interrogation, the primary purpose of which was to gather evidence for prosecutorial purposes. Similarly, in T.P., the complained of statements were elicited from a minor during an interview conducted by both a social worker and a sheriffs investigator as part of a criminal investigation. See T.P., 911 So.2d at 1123 (concluding that “the interview was intended to be used as an investigative tool for a potential criminal prosecution”). Likewise, in Snowden, the complained of statements, as found by the Maryland Supreme Court when it later heard the case on certiorari, were made to a social worker during an interview conducted at the behest of a police investigator and in the investigator’s presence. See State v. Snowden, 385 Md. 64, 867 A.2d 314, 317 (Md.2005) (finding also that each declarant knew that the reason for the interview was because of their allegations against the defendant).
¶ 52. Contrary to Madden’s assertion, there is no indication in the record that law enforcement was ever intimately involved in Jane’s therapy sessions. Nor does the record support Madden’s contention that DHS’s motivation for referring Jane to the Shafer Center was to look for evidence to use in a future prosecution. Rather, it fairly illustrates that DHS’s pri *1229 mary reason for contacting the center was due to the harmful behavior Jane reportedly had been exhibiting toward herself and to others. Cf Bishop, 982 So.2d at 375 (¶ 13) (finding minor’s statements to child therapist were nontestimonial because interactions were strictly for purposes of treatment and not for prosecuto-rial purposes). The fact that Barnes thereafter contacted DHS and the district attorney’s office and reported what she had observed only demonstrates that she was acting in accordance with Mississippi Code Annotated section 43-21-353 (Rev. 2009).
¶ 53. Accordingly, we find that Jane’s statements to Barnes were nontestimonial and did not implicate Madden’s Sixth Amendment right of confrontation.
¶ 54. This issue is without merit.
IV. WHETHER THE TRIAL COURT ERRED WHEN IT ALLOWED BARNES TO TESTIFY OUTSIDE THE AREA OF HER EXPERTISE.
¶ 55. Madden argues that Barnes was offered and accepted as an expert in marriage and family therapy, not forensic examination of children alleged to have been sexually abused. Madden asserts that Barnes’s testimony that Jane’s behavior and statements were consistent with a child who has been sexually abused was improper and inadmissible. Madden contends that under Daubert principles, Barnes’s testimony was not remotely determinable by her expertise, and her opinion was irrelevant because it had no reliable relation to the determination of a material fact.
¶ 56. The admission of expert testimony lies within the sound discretion of the trial court. Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (¶ 4) (Miss.2003). Rule 702 of the Mississippi Rules of Evidence states:
If scientific, technical or other specialized knowledge will assist the trier of fact to understand or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
¶ 57. In McLemore, the Mississippi Supreme Court adopted the Daubert standard for determining the admissibility of expert testimony. McLemore, 863 So.2d at 39 (¶ 5). The supreme court explained the Daubert rule as follows:
[T]he analytical framework provided by the modified Daubert [v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)] standard requires the trial court to perform a two-pronged inquiry in determining whether expert testimony is admissible under 702. The modified Daubert rule is not limited to scientific expert testimony — rather, the rule applies equally to all types of expert testimony. First, the court must determine that the expert testimony is relevant — that is, the requirement that the testimony must “assist the trier of fact” means the evidence must be relevant. Next, the trial court must determine whether the proffered testimony is reliable. Depending on the circumstances of the particular case, many factors may be relevant in determining reliability, and the Daubert *1230 analysis is a flexible one. Daubert provides “an illustrative, but not an exhaustive, list of factors” that trial courts may use in assessing the reliability of expert testimony.
Id. at 38 (¶ 16) (internal citations omitted).
¶ 58. Barnes was admitted by the trial court as an expert in marriage and family counseling, both at the pretrial hearing and at trial. Her qualifications included a bachelor’s degree in child and family studies from the University of Southern Mississippi; a master’s degree in marriage and family therapy from the same university; and a Mississippi license in marriage and family therapy. In obtaining her master’s degree, Barnes completed five-hundred hours of supervised “face-to-face” contact with couples and families; the majority of those hours were spent with young children. For her licensure requirements, Barnes completed one-thousand hours of client contact, two-hundred hours of which were under the supervision of a licensed marriage and family therapist and a clinical social worker. Thereafter, she was permitted to sit for the board examination for marriage and family therapist. Barnes has testified in both chancery court and juvenile court. This, however, was her first time to testify in a criminal matter, and it was her first time to be admitted as an expert in her field.
¶59. In Bishop, the supreme court found no abuse of discretion in the trial court’s decision to allow expert testimony from a child therapist who had conducted therapeutic sessions with a sexual-abuse victim, not unlike those we find were conducted in this case. Bishop, 982 So.2d at 381 (¶¶ 34-35). The Bishop court reiterated that “an expert may not offer an opinion as to the veracity of the alleged victim, that is, whether the alleged child sexu-
al[-]abuse victim has been truthful”; but “it is within the scope of permissible testimony for an expert to testify regarding his or her opinion that the alleged victim’s characteristics are consistent with a child who has been sexually abused.” Id. at (¶ 33).
¶ 60. Here, the only expert testimony given by Barnes was as follows:
Q. Now, based on your training that we’ve already heard and your counseling sessions with [Jane], did you form an opinion as to whether or not [Jane] had been sexually abused?
A. Yes.
Q. What was that opinion?
A. That she was consistent with a child that had been sexually abused.
Q. What did you base that on, if you can just tell the jury?
A. Based on her sexually acting out on self and others, based on her frequency of urination, based on her behavior as far as knowledge of sexual parts, and based on her terminology of sexual parts her body and others, she was consistent of a child that was sexually abused.
Q. You said “acting out.” What do you mean by acting out?
[[Image here]]
A. From what I’ve seen and heard, she was verbally talking about her sexual part, licking others, masturbating herself, also talking about sexually acting out on children at day care, sexually arousing herself.
¶ 61. Barnes did not testify that sexual abuse had in fact occurred. Nor did she opine on the credibility of Jane’s statements. In line with the Bishop court’s finding, we find that the trial court did not *1231 abuse its discretion in admitting Barnes’s expert testimony.
¶ 62. This issue is without merit.
V. WHETHER THE TRIAL COURT ERRED BY REFUSING DEFENSE COUNSEL’S PROFFERED CIRCUMSTANTIAL-EVIDENCE INSTRUCTION.
¶ 63. Madden contends the trial court erred by refusing jury instruction D-7, a circumstantial-evidence instruction, which states:
The court instructs the jury that if the State has relied on circumstantial evidence to establish its theory of guilt of the defendant, then the evidence for the State must be so strong as to establish guilt of the defendant, not only beyond a reasonable doubt, but the evidence must be so strong as to exclude every other reasonable hypothesis other than guilt.
¶ 64. The law is clear, a circumstantial-evidence instruction need only be given where there is no direct evidence of a crime. King v. State, 580 So.2d 1182, 1191 (Miss.1991) (citing Gray v. State, 549 So.2d 1316, 1324 (Miss.1989)). Generally, a circumstantial-evidence case is one in which there is neither an eyewitness nor a confession to the crime. Mangum v. State, 762 So.2d 337, 344 (¶ 21) (Miss.2000); see also Foley v. State, 914 So.2d 677, 686 (¶ 15) (Miss.2005) (“[T]here are certainly more types of direct evidence than eyewitness testimony or confessions.”).
¶ 65. Jane was an eyewitness to the sexual abuse allegedly committed upon her person, and her statements to others about the abuse, thus, constituted direct evidence of the crimes. See Foley, 914 So.2d at 687 (¶ 16). Accordingly, we find no error with the trial court’s decision to refuse jury instruction D-7.
¶ 66. This issue is without merit.
VI. WHETHER THE INDICTMENT ADEQUATELY INFORMED MADDEN OF THE NATURE OF THE CHARGES AGAINST HER OR, IN THE ALTERNATIVE, WHETHER THE STATE PRESENTED SUFFICIENT EVIDENCE AS TO THE DATE OF THE ALLEGED OFFENSE.
¶ 67. Madden argues that her indictment failed to notify her adequately of the nature and cause of the accusations against her. Specifically, Madden contends that due to the broad date-range language in the indictment, she was unable to defend herself fully against the charges, other than by denying involvement. She also contends that the State presented no evidence at trial of the date(s) of the alleged offense(s).
¶ 68. Whether the indictment sufficiently notified the defendant of the charge against her is a question of law reviewed under a de novo standard. Winters v. State, 52 So.3d 1172, 1174 (¶ 7) (Miss.2010).
¶ 69. Our supreme court has held that “an allegation as to the time of the offense is not an essential element of the offense charged in an indictment[;] ... within reasonable limits, proof of any date before the return of the indictment and within the statute of limitations is sufficient.” Daniels v. State, 742 So.2d 1140, 1143 (¶ 10) (Miss.1999) (citation and internal quotations omitted). “Further, specific dates are not required in sexual[-]abuse indictments so long as the defendant is fully and fairly advised of the charges against him.” Frei v. State, 934 So.2d 318, 325 (¶ 20) (Miss.Ct.App.2006) (citing Morris v. State, 595 So.2d 840, 842 (Miss.1991)).
¶ 70. In Frei, this Court addressed a similar challenge to an indict *1232 ment with regard to the sufficiency of the dates alleged therein; we found the claim was waived due to the defendant’s failure to demur to the indictment in the trial court below. Id. Similarly, Madden did not object to the “broad date-range language” contained in her indictment. Therefore, we deem her claim waived.
¶ 71. Procedural bar notwithstanding, we nonetheless find that Madden’s indictment fully and fairly apprised her of the charges against her and did not prohibit her from preparing any defense to the charges.
¶ 72. Madden was charged with violating Mississippi Code Annotated section 97-3-95(1) (Rev.2006) and Mississippi Code Annotated section 97-5-39(l)(c) (Rev.2006), respectively. Section 97-3-95(1) provides, in part, as follows:
A person is guilty of sexual battery if he or she engages in sexual penetration with:
[[Image here]]
(d) A child under the age of fourteen (14) years of age, if the person is twenty-four (24) or more months older than the child.
Sexual penetration is defined in Mississippi Code Annotated section 97-3-97(a) (Rev.2006) as, “cunnilingus, fellatio, buggery or pederastry, any penetration of the genital or anal openings of another person’s body by any part of a person’s body, and insertion of any object into the genital or anal openings of another person’s body.” Section 97 — 5—39(l)(c) provides, in part, that:
A parent, legal guardian or other person who knowingly permits the continuing physical or sexual abuse of a child is guilty of neglect of a child and may be sentenced to imprisonment for not more than ten (10) years or to payment of a fine of not more than Ten Thousand ■ Dollars ($10,000.00), or both.
¶ 73. We first point out that Madden had asserted at trial that she, Conley, and her two children were living outside the jurisdiction of Forrest County during the dates set forth in her indictment. The State, however, presented evidence that during this time frame, the family actually lived in the home of Madden’s mother, which was located in Forrest County. The jury, obviously, decided in favor of the State’s evidence, having found beyond a reasonable doubt that the offenses occurred in Forrest County. How Madden’s jurisdictional claim would have fared differently had it not been for the “broad date-range language” in the indictment is beyond this Court’s purview.
¶ 74. Madden’s other contention — that the State failed to present evidence of the dates of the alleged offenses — challenges the sufficiency of the evidence. In reviewing the sufficiency of the evidence, the relevant inquiry is whether, “viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.” Bush v. State, 895 So.2d 836, 843 (¶ 16) (Miss.2005) (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).
¶ 75. Based on the evidence presented at trial, Jane reportedly told Sue that the sexual abuse had occurred in the bedroom and the bathroom in the home where she was living with her mom (Madden) and dad (Conley). Rational minds could reasonably conclude from the State’s evidence that Jane was referring to Madden’s mother’s home in Forrest County.
¶ 76. Also, time was not an essential element for either offense in this case. Jane, undisputably, was under the age of fourteen and at least twenty four months *1233 Madden’s junior at the time the alleged sexual battery occurred. See Miss.Code Ann. § 97 — 3—95(l)(d). And for purposes of section 97-5-39, the term “child” as used in that section, is defined by Mississippi Code Annotated section 43-21-105 (Supp. 2011) as a person under the age of eighteen.
¶ 77. Notably, there is no statute of limitations for either offense. See Miss. Code Ann. § 99-1-5 (Supp.2011). Thus, when exactly these offenses occurred was immaterial. See, e.g., McBride v. State, 61 So.3d 174, 184 (¶ 33) (Miss.Ct.App.2010) (holding that in a prosecution under section 97 — 3—95(l)(d), where sufficient evidence at trial proved the victim was under age fourteen at the time of the crime, “the time frame of the incident is not relevant because it is not an element of the crime”).
¶ 78. Furthermore, Madden’s indictment set forth an approximate time frame in which the charged offenses had allegedly occurred. This is suitable practice in these types of cases. As we explained in McBride, “[i]t is not uncommon in cases dealing with the sexual crimes against a child-victim that the time of the crime is less specific in the indictment.” Id. at 184 (¶ 35). Due to the “nature of the crime” and the “trauma” it inflicts, victims — especially children — may have difficulty identifying the exact date(s) of the crime. Id.
¶ 79. In upholding our decision in McBride, the Mississippi Supreme Court held that where “ ‘on or about’ language is used in an indictment, the [State] is not required to prove [the] exact date(s) so long as a date reasonably near is established.” McBride v. State, 61 So.3d 138, 150 (¶ 51) (Miss.2011).
¶ 80. Viewing the evidence in the light most favorable to the State, and giving the State the benefit of all favorable inferences that can be drawn therefrom, there is sufficient evidence for a reasonable fact-finder to find that the offenses charged in the indictment occurred within, or reasonably near, the time frame set forth in Madden’s indictment.
¶ 81. This issue is without merit.
VII. WHETHER THE STATE PRESENTED SUFFICIENT EVIDENCE TO CONVICT MADDEN OF CHILD NEGLECT.
¶ 82. Madden argues that the State presented no evidence that the alleged abuse perpetrated by Conley was continuous in nature. She adds that: “More importantly, however, the State presented absolutely no evidence whatsoever that Madden permitted Conley to abuse [Jane].”
¶ 83. The elements to felony child abuse and our standard of review with regard to the sufficiency of the evidence were stated in the preceding issue.
¶ 84. Jane related a number of instances to others that both Madden and Conley, repeatedly, sexually abused her during the time that they lived in the home owned by Madden’s mother. Evidence was presented that Madden was Jane’s primary caregiver and that Jane was practically always in her sight.
¶ 85. Viewing this evidence in the light most favorable to the State, we find that a rational trier of fact could have found the essential elements of felony child abuse beyond a reasonable doubt.
¶ 86. This issue is without merit.
¶ 87. THE JUDGMENT OF THE FORREST COUNTY CIRCUIT COURT IS REVERSED, AND THIS CASE IS REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. ALL COSTS OF THIS APPEAL ARE ASSESSED TO FORREST COUNTY.
*1234 LEE, C.J., BARNES, ISHEE, ROBERTS AND RUSSELL, JJ., CONCUR. IRVING AND GRIFFIS, P.JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. CARLTON AND MAXWELL, JJ., DISSENT WITHOUT SEPARATE WRITTEN OPINION.

. To protect the minor’s identity, the minor's name, and the names of her sister and foster parents have been replaced with pseudonyms.

. In Mississippi, “there is a rebuttable presumption that a child under the age of twelve is of tender years.” Veasley v. State, 735 So.2d 432, 436 (¶ 16) (Miss.1999). Jane was three years old at the time she reportedly made her disclosures; thus, there is no dispute that she was a child of tenders years.