# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00509-COA

**SHERRY WESTMORELAND**                                          **APPELLANT**

**v.**

**STATE OF MISSISSIPPI**                                          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/2019 |
| TRIAL JUDGE: | HON. JOHN ANDREW GREGORY |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: MOLLIE MARIE McMILLIN |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: META S. COPELAND |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/30/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE CARLTON, P.J., LAWRENCE AND SMITH, JJ.

### LAWRENCE, J., FOR THE COURT:

¶1.     Sherry Westmoreland was convicted on October 18, 2019, of three felony counts of child neglect and one misdemeanor count of failure to report a sex crime against a minor. The Lafayette County Circuit Court sentenced Sherry to serve three concurrently running ten-year terms in the custody of the Mississippi Department of Corrections (MDOC). Sherry was required to pay a $500 fine for the misdemeanor. Sherry filed a motion for a new trial, which the court denied. Sherry appealed.

¶2.     Sherry raises two issues on appeal: (1) the evidence was insufficient to support the convictions on her felony and misdemeanor charges; and (2) her counsel was constitutionally

ineffective for failing to request a circumstantial-evidence jury instruction. This Court finds

there was sufficient evidence to support Sherry's convictions and that Sherry fails to establish

she received ineffective assistance of counsel. Therefore, the judgment of the circuit court

is affirmed.

## FACTS AND PROCEDURAL HISTORY

¶3.     Sherry began running an unlicensed daycare out of her home in Harmontown,

Mississippi, in May 2009. Her husband, John, worked away from the home during the day

but returned home from work when the children whom Sherry kept were still there. Sherry

kept many children at her home, including Mary,[1] Lucy,[2] Anne,[3] Katie,[4] Susan,[5] and Ellie.[6]

At the time of the discovery of the abuse, Mary was nine years old, Lucy was ten years old,

Anne was ten years old, Katie was eleven years old, and Susan was nine years old.[7] On July

---

[1] Because there are a total of six minor-victims and an additional minor-witness, we use pseudonyms instead of initials to make the opinion easier to follow. Mary is the child addressed as D.H. in Count VIII of the indictment. She is referred to as T.H., her nickname, in both the appellant's and appellee's briefs.

[2] Lucy is referred to as J.H. in the indictment and briefs.

[3] Anne is referred to as S.B.H. in the indictment and briefs.

[4] Katie is referred to as L.P. in the indictment and briefs.

[5] Susan is referred to as A.R. in the indictment and briefs.

[6] Ellie is referred to as K.W. in the indictment and briefs.

[7] Ellie's age is not in the record. The indictment indicates that she was under the age of eighteen.

2, 2018, Betty (Jane's[8] mother) called Eleanor (Anne's mother[9]) to talk to her about Sherry's daycare. Betty said that her daughter Jane told her she saw John put his tongue in Katie's mouth. Betty told Eleanor that Jane was worried John may have done the same thing to Anne. Betty told Eleanor that Jane sent Anne a Snapchat[10] message and asked if John had kissed her and put his tongue in her mouth. Anne responded to Jane and said that he did. After the phone conversation with Betty, Eleanor spoke with Anne, who confirmed to her what had happened. Eleanor contacted the police. A police investigation led to the indictments of John and Sherry Westmoreland.

¶4. In October 2018, Sherry's husband John was indicted on six counts of touching a child for lustful purposes and one count of sexual battery. John pled guilty to four counts of touching a child for lustful purposes. Sherry was also indicted on six counts of child neglect for unlawfully, feloniously, and knowingly permitting the continued sexual abuse of six children in her care.

¶5. Sherry's trial began on October 15, 2019. The State alleged Sherry knew about the sexual abuse that occurred in the living room of her home. The State called nine witnesses to prove that Sherry knew about the sexual abuse that occurred in her household and did

---

[8] Jane is referred to as C.B. in the briefs. Jane was an eyewitness to some of the sexual abuse, including the abuse that happened to Anne. Jane testified at trial but was not listed as a victim in any counts of the indictment. This Court will use the fictitious name of Betty for Jane's mother in an effort to protect the minor's identity.

[9] This court will use the fictitious name of Eleanor for Anne's mother to protect the minor's identity.

[10] Snapchat is a form of social media that allows users to communicate with one another through pictures and text that are only viewable for a finite amount of time.

nothing to prevent it.

¶6. Brad McDonald was the State's first witness. Investigator McDonald was the lead investigator in the Westmoreland case and executed the search of Sherry's home upon John's arrest. Investigator McDonald testified that when he arrived at Sherry's home to execute the search warrant, Sherry said that she had told John to stop kissing kids on the mouth because they were getting too old: "[Sherry] made a comment to me. John was a good man, and she loved the kids. . . . [S]he told me he did not need to kiss the kids on their mouth because they were getting too old." McDonald also testified that Sherry was the only one at the daycare responsible for the "safety and welfare of the children."

¶7. Misty Applegate testified about the forensic interview she conducted with Mary. That interview was played for the jury. In the interview, Mary told Misty Applegate about two times John sexually abused her. During the first incident, John held Mary down in his lap in the living room chair and digitally penetrated her. Mary said Sherry was in the kitchen washing dishes, but Sherry watched this happen. Mary knew Sherry saw what happened because Mary clapped her hands to get Sherry's attention. When she clapped, Sherry turned around, smiled at Mary and John, and turned back around to continue washing dishes. When John stopped, Mary got up to tell Sherry what happened. Sherry said, "I'm busy trying to do something, go sit down." Mary said she tried one more time to tell Sherry, and Sherry yelled, "Go play with [Katie]." The second incident of sexual abuse occurred two days after the digital penetration. John grabbed Mary by the face, kissed her, and put his tongue in her mouth. Mary told Misty Applegate that Sherry saw this but did nothing. Mary said John

4

stuck his tongue in her mouth, and "Mrs. Sherry, his wife, she watched him do that, and she didn't say anything." After John kissed Mary and put his tongue in her mouth, Mary told Sherry. Sherry responded, "Whatever," and continued washing dishes. Mary said that Sherry "didn't care about anything" that happened at the daycare. Misty Applegate found that Mary made disclosures that were consistent with a child who had been sexually abused.

¶8. Mary testified at the trial about her forensic interview with Misty Applegate and about the two times John sexually abused her. Mary stated that she clapped to get Sherry's attention when John was digitally penetrating her. When Mary clapped, Sherry turned around, smiled at her, and went back to washing dishes. Mary also testified that Sherry saw John kiss her because she could see Sherry watching. Specifically, Mary stated that she knew Sherry was watching because "whenever [John] pulled my head back, she was like looking at me."

¶9. Eleanor also testified at trial. Eleanor testified that Anne had been going to Sherry's daycare since she was seven or eight months old. Eleanor expected Sherry to inform her about any issues that occurred at the daycare because Sherry was the one in charge. On July 2, 2018, Eleanor received a call from Betty, whose child had also been in Sherry's care. Betty told Eleanor that John had been inappropriately kissing children at the daycare, and Anne may be one of the children who had been kissed. Prior to this call, Eleanor had no idea John had been inappropriately touching Anne. She testified that she spoke to Anne about John after the call ended. Anne told her that John had kissed her and put his tongue in her mouth. After Eleanor spoke to her daughter Anne, she contacted law enforcement. The next

5

day, Anne and her father went to speak with Investigator McDonald. Later, Anne had a forensic interview with Emily Thomas.

¶10. Emily Thomas testified about her forensic interview with Anne. That interview was also played for the jury. Anne described two different occasions when John kissed her and put his tongue in her mouth. The first kiss happened in the living room. John called Anne over, "touched [her] in places [she] didn't want to be touched," kissed her, and put his tongue in her mouth. Anne tried to pull away, but John pulled her in closer. Jane, another child at the daycare, saw this kiss. Anne did not know where Sherry was during this kiss, and she never told Sherry about it. The second kiss occurred while Sherry was in the back room. John called Anne over from the kitchen, kissed her, and put his tongue in her mouth. He would do this every ten minutes. The only other people in the room were two boys and a baby. Anne did not tell Sherry about this incident. Anne said she felt like Sherry "always turned her head" to the abuse. Anne also told Emily Thomas that Sherry would see John touch and kiss girls, and she did not understand why Sherry would not stop John: "Sherry would be sitting right there. . . . [H]ow did she not see it?" Based on Anne's disclosures, Emily Thomas found that Anne made a disclosure that was consistent with a child who had been sexually abused.

¶11. Anne testified about the sexual abuse she experienced at Sherry's daycare. Anne stated that she received a Snapchat message from Jane asking if John had ever put his tongue in her mouth when he kissed her. Anne responded that he did. Anne also stated that Sherry was in the backroom during one of the kisses, and she did not tell Sherry about the kiss.

¶12.    Paige Mormon testified about the two forensic interviews she conducted with Susan and Katie[11] about the sexual abuse that occurred at Sherry's daycare. Susan's interview was played for the jury. Susan stated that the sexual abuse at the daycare happened on more than one occasion. Susan said John was "doing something sexual that I didn't want to be a part of." Susan stated that John "put his tongue in my mouth, and he did it with other kids too." Susan said Sherry saw John put his tongue in her mouth. Sherry was sitting on the chair "like twenty inches away" and did not say or do anything. Susan said Sherry was "close" by every time John sexually abused the girls who attended the daycare, and she would just "sit there and watch T.V." Paige Mormon found that Susan made disclosures that were consistent with a child who had been sexually abused.

¶13.    Susan testified about the abuse she experienced at the daycare. Specifically, Susan stated that John kissed her and put his tongue in her mouth while they sat on the couch in the living room. When Susan was asked where Sherry was when John put his tongue in her mouth, Susan said Sherry was "in the chair a few inches away from the couch."

¶14.    Paige Mormon conducted a second interview with Katie, but Katie did not disclose any information during her interview. Paige Mormon's report on Katie was inconclusive.[12] The testimony from the other victims provided additional information about John's abuse of

_____

[11] Katie is Sherry's granddaughter. John is Katie's step-grandfather. Katie was eleven years old at the time of the abuse.

[12] Paige Mormon explained what it means for a finding of "inconclusive." "[I]nconclusive versus no finding is different, so no finding means that there was no type of alarm or anything, any kind of red flag to let you know that maybe something has occurred. But my findings for [Katie] were inconclusive."

Katie and Sherry's knowledge of the abuse. Susan told Paige Mormon that Sherry "just sits there and watches T.V." when John kisses Katie. Anne said in her forensic interview that she saw John touch Katie on her buttocks, kiss her with his tongue, and put his hands in her pants. Jane also saw John sexually abuse Katie in the living room while Sherry watched from the kitchen table.

¶15.     Jane was the State's final witness. Jane was not a victim in the indictments against John or Sherry.  However, she testified about what she saw while she was at Sherry's daycare.  Jane testified that the girls at Sherry's daycare would "try to stay in the back room when [John] got there" because they did not want to be around him.  Girls would have to be near John if Sherry called them out to the living room to "get love" from John.  When Jane would go to the kitchen to get a drink or snack, she would see girls sitting in John's lap while he rubbed their backs.  Jane saw John kiss Anne.  Jane described this kiss as "like making out."  Jane said Sherry was sitting at the kitchen table working on bills when John kissed Anne and put his tongue in her mouth.  Jane confirmed that she sent Anne a Snapchat message and asked if John ever put his tongue in her mouth.  Anne responded and said John did.  Jane also testified that Sherry saw John put his tongue in Katie's mouth because Sherry was sitting at the kitchen table.  Jane did not tell Sherry about these incidents, but Jane stated that Sherry saw John make out with the girls.

¶16.     The defense called two witnesses: John and Sherry.  Both testified that Sherry did not know that John was sexually abusing the children at the daycare.  John testified that he would wait to abuse the children when Sherry left the living room to check the mail, went to the

back of the house, or turned around in the kitchen to wash dishes. John stated that Sherry did not know he was abusing the girls, and if she had known, she would have stopped him. John admitted that Sherry would call the girls to come "get some lovin'" from him. However, he denied that Sherry ever saw him sexually abuse any of the girls.

¶17. Sherry testified that John was only in the house for twenty minutes each day. John would come home from work, give the children hugs or pecks, sit and watch the news, and leave to care for his dogs or go fishing. She stated that she never saw John kiss any of the children or put his tongue in their mouths. If she would have seen him do that, she maintained that she would have stopped him and called the police. Sherry also stated that she did not pay much attention to her husband when he was in the house because she was busy filling bottles, making snacks, or helping kids with homework. She said neither Anne, Susan, Mary, nor Katie told her that John had touched them inappropriately.

¶18. Sherry could not remember a time when Mary clapped to get her attention while Mary was being digitally penetrated by John. She also could not remember a time when Mary tried to tell her about John touching her inappropriately. Sherry conceded that it was possible Mary tried to tell her but that Sherry was too busy to listen. Sherry also stated that she would never let any harm come to her grandchild Katie. Finally, Sherry admitted that she told John to stop kissing the kids after she saw him kiss Anne, who then wiped her mouth.

¶19. On October 18, 2019, Sherry was convicted of three felony counts of child neglect as to the children Anne, Susan, and Katie and one misdemeanor count of failure to report a sex crime against a minor as to the child Mary. She was found not guilty by the jury as to the

9

counts regarding the children Lucy and Ellie. Sherry filed a motion for a new trial, which was denied. Sherry timely appeals, raising two issues: (1) the evidence was insufficient to support convictions of her felony and misdemeanor charges; and (2) her counsel was ineffective for failing to request a circumstantial evidence jury instruction.

## STANDARD OF REVIEW

¶20. Rulings on sufficiency of the evidence are reviewed de novo. *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018). Ineffective-assistance-of-counsel claims are reviewed under a two-part test, which requires the defendant to show that her attorney's performance was deficient and that the attorney's deficiency prejudiced her defense. *Jackson v. State*, 815 So. 2d 1196, 1200 (¶8) (Miss. 2002).

## ANALYSIS

### 1. Sufficiency of the Evidence

¶21. Sherry first argues that the State failed to prove she knew about the sexual abuse and did nothing to stop it. When reviewing a challenge to the sufficiency of the evidence, the relevant question is whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Sanford v. State*, 247 So. 3d 1242, 1244 (¶10) (Miss. 2018) (internal quotation marks omitted) (quoting *Hearn v. State*, 3 So. 3d 722, 740 (¶54) (Miss. 2008)). The evidence is viewed in a light most favorable to the State, which means the State is given all favorable inferences that can be reasonably drawn from the evidence that was presented at trial. *Henley v. State*, 136 So. 3d 413, 415 (¶8) (Miss. 2014). If the court finds that a reasonable trier of fact could find the essential elements to be proven

10

beyond a reasonable doubt, the court will uphold the verdict. *Ronk v. State*, 172 So. 3d 1112, 1129 (¶3) (Miss. 2015).

¶22.    Sherry was convicted of felony child neglect pursuant to Mississippi Code Annotated section 97-5-39(1)(e) (Supp. 2013). That section provides that a person who "knowingly permits the continuing physical or sexual abuse of a child is guilty of neglect of a child . . . ." On appeal, Sherry argues the State failed to show that she knew John was sexually abusing children, and because she did not know about the sexual abuse, she could not do anything to stop it.

¶23.    In 2011, this Court decided *Madden v. State*, 97 So. 3d 1217 (Miss. Ct. App. 2011), which is similar to the present case. In *Madden*, this Court found that the evidence presented at Amy Madden's criminal trial was sufficient to convict her of felony child neglect of her daughter Jane Doe. *Id.* at 1219, 1233 (¶¶1-2, 80). Madden was convicted of felony child neglect for allowing Scott Conley, Jane's father, to sexually abuse Jane. *Id.* at 1219 (¶2). Evidence of Conley sexually abusing Jane was first discovered by Sue and John Smith after the Mississippi Department of Human Services placed Jane and her sister in their care. *Id.* at 1220 (¶4). While in the care of Sue and John Smith, Jane told Sue about numerous times when her mother or her father sexually abused her. *Id.* at (¶5). The Smiths contacted authorities, and a forensic interview was scheduled. *Id.* at (¶6). The forensic interview was inconclusive. *Id*. A medical examination was also conducted, but the examination did not confirm or deny if sexual abuse had occurred. *Id.* at (¶7).

¶24.    Jane continued to make disclosures to Sue Smith about the sexual abuse she

experienced. *Id.* at 1220-21 (¶¶8-10). Jane and Sue went to the Shaffer Center in Hattiesburg, Mississippi, for another evaluation. *Id.* at 1221 (¶11). Jane made a disclosure of sexual abuse in this evaluation, and the police were contacted. *Id.* at 1222 (¶14). Jane had seventeen additional therapy sessions at the Shaffer Center, where she made numerous disclosures about her mother and father sexually abusing her. *Id.* at (¶¶15-17). At Madden's criminal trial, the statements Jane made to her therapist were admitted into evidence. *Id.* at (¶20-21). Madden testified on her own behalf, stating that she never saw Conley sexually abuse Jane. *Id.* at (¶19). Madden was ultimately convicted of sexual battery and felony child neglect for allowing Conley to sexually abuse Jane. *Id.* at 1223 (¶27).

¶25.    Madden appealed her convictions, arguing in part that there was insufficient evidence to convict her. *Id.* This Court found that the evidence presented by the State was sufficient for a rational trier of fact to find the essential elements of felony child neglect: "Jane related a number of instances to others that both Madden and Conley, repeatedly, sexually abused her during the time that they lived in the home owned by Madden's mother. Evidence was presented that Madden was Jane's primary caregiver and that Jane was practically always in her sight." *Id.* at 1233 (¶84).

¶26.    Sherry was also the primary caretaker of the children at her daycare. Anne's mother and Investigator McDonald testified that Sherry was the person in charge of caring for the children. Anne's mother even stated that she expected Sherry to tell her if something bad happened at the daycare. Susan, Anne, and Mary all stated that Sherry was in the room when John sexually abused them. Jane also testified that she would see Sherry sitting at her

12

kitchen table while John sexually abused the girls at the daycare. Sherry was the girls' primary caregiver while they were at her daycare, and the State provided evidence to show the girls were in her sight when John sexually abused them.

¶27. At Sherry's criminal trial, the State presented witnesses who testified that Sherry was either in the kitchen, sitting next to the children and John, or in the backroom when the abuse occurred. Evidence was also presented to show the living room and the kitchen were part of one large room separated only by a kitchen table.

¶28. The State presented testimony from Anne, Jane, and Emily Thomas, the forensic interviewer, to prove beyond a reasonable doubt that Sherry knowingly permitted John's sexual abuse of Anne. Anne told Emily Thomas in her forensic interview that Sherry would be "sitting right there," when the abuse happened and expressed disbelief that Sherry did not see the abuse. Anne also stated in her forensic interview that Sherry "turned her head" to the abuse when it happened. Jane saw John kiss Anne and put his tongue in her mouth. Jane stated that Sherry was at the kitchen table paying bills when John kissed Anne and put his tongue in her mouth. Specifically, Jane said Sherry was watching from the chair in front of her oven at the kitchen table. Anne confirmed that John kissed her and put his tongue in her mouth in a Snapchat message to Jane. Finally, Sherry admitted that she told John to stop kissing the kids on the mouth after she saw John kiss Anne, and Anne wiped her mouth.

¶29. Further, the State presented testimony from Paige Mormon and Susan to prove beyond a reasonable doubt that Sherry knowingly permitted John's sexual abuse of Susan. Paige Mormon testified that Susan told her Sherry would watch John kiss her. Paige Mormon also

13

testified that Susan said Sherry was "twenty inches away," watching television while John kissed her and put his tongue in her mouth. Susan also told Paige Mormon that Sherry had seen John kiss her more than once. Susan testified in court that while she was sitting on the couch with John, he kissed her and put his tongue in her mouth. Sherry was sitting a few inches away in the living-room chair.

¶30. The proof as to the felony conviction of child neglect of Katie was provided through the testimony of eyewitnesses and forensic interviewer Paige Mormon. Jane testified that she saw John kiss Katie while Sherry watched from the kitchen table. Anne testified that she saw John kiss Katie and put his tongue in her mouth. Anne also saw John touch Katie's "bottom." Paige Mormon also testified that Susan told her that she saw John kiss Katie and put his tongue in her mouth while Sherry sat next to them and watched television.

¶31. Jane testified about seeing the abuse and added important evidence to Sherry's knowledge of the abuse happening at the daycare. Jane testified that the girls would always stay in the backroom when John got home because no one wanted to be around him. However, Sherry would call one or two girls from the backroom to come "get love" from John. Jane saw John rubbing girls' backs as they sat in his lap. Jane also saw John kiss Anne and described the kiss as "like making out." Jane also saw John kiss Katie and put his tongue in her mouth. Jane testified that on those occasions, Sherry was sitting at the kitchen table paying bills and watching John.

¶32. Sherry was also convicted for the misdemeanor offense of failure to report a sex crime against a minor pursuant to Mississippi Code Annotated section 97-5-51 (Supp. 2013). This

14

section includes a list of individuals who are considered mandatory reporters. A mandatory reporter is required by law to "make a report if it would be reasonable for the mandatory reporter to suspect that a sex crime against a minor has occurred." Miss. Code Ann. § 97-5-51(2)(a). An unlicensed daycare provider is considered a mandatory reporter. Miss. Code Ann. § 97-5-51(1)(e). Sherry was a mandatory reporter. She owned and ran an unlicensed daycare out of her home. Therefore, she had a legal duty to report any reasonably suspected sex crimes against the minor children in her daycare. On appeal, Sherry argues that she lacked the knowledge necessary to require her to make a report of a sex crime against a minor.

¶33. The State presented testimony from Mary and Misty Applegate, the forensic interviewer, to prove beyond a reasonable doubt that Sherry knew Mary was being sexually abused and failed to report it. Mary testified in court that she knew Sherry watched John kiss her and put his tongue in her mouth because she could see Sherry watching when John pulled her head back. In her forensic interview, Mary said John stuck his tongue in her mouth, and "Mrs. Sherry . . . watched him do that and she didn't say anything." Misty Applegate also testified that Mary clapped to get Sherry's attention when John was digitally penetrating Mary in the living room. Mary clapped, Sherry turned around, looked at John and Mary, smiled, and turned back around to wash dishes in the kitchen. When Mary tried to tell Sherry about what happened, Sherry dismissed Mary.

¶34. Sherry did present conflicting evidence to show that she did not know any of the sexual abuse occurred. Sherry testified that she did not see any of the sexual abuse that

occurred in her home. John also testified that he waited until Sherry left the room or had her back turned before he touched the girls. However, Sherry and John admitted that Sherry told John to stop kissing the kids after Sherry saw Anne wipe one of John's kisses away. Sherry told Investigator McDonald that she made this statement to John.

¶35. The jury is the ultimate trier of fact. *Brown v. State*, 764 So. 2d 463, 467 (¶9) (Miss. Ct. App. 2000). The jury must "listen to the evidence, observe the demeanor of the witnesses, and decide the credibility of the witnesses and what weight to give any particular piece of evidence." *Id.* The jury is responsible for weighing conflicting testimony and determining the worth of it. *Howell v. State*, 860 So. 2d 704, 731 (¶92) (Miss. 2003). "All the proof need not be direct[,] and the jury may draw any reasonable inferences from all the evidence in the case." *Hampton v. State*, 309 So. 3d 1055, 1062 (¶33) (Miss. 2021). Here, the jury weighed all the evidence and found Sherry guilty on three felony counts of child neglect and one misdemeanor count of failure to report a sex crime. Considering the evidence in a light most favorable to the State, this Court finds that there was sufficient evidence, based on the testimony provided, that could lead a reasonable trier of fact to conclude beyond a reasonable doubt that Sherry knowingly permitted the continued sexual abuse of Anne, Susan, and Katie. There was also sufficient evidence for a jury to reasonably conclude beyond a reasonable doubt that Sherry violated the mandatory-reporter requirement because it was reasonable for Sherry to suspect that a sex crime against Mary occurred.

## 2. Ineffective Assistance of Counsel

¶36. Sherry also argues that her counsel was constitutionally ineffective for failing to

16

request a circumstantial evidence jury instruction. The Mississippi Supreme Court has recently overruled the requirement of a circumstantial evidence jury instruction. In *Nevels v. State*, the Supreme Court stated that the jury instruction for circumstantial evidence requiring a heightened burden of proof—"to the exclusion of every reasonable hypothesis consistent with innocence"—is incorrect. *Nevels v. State*, 325 So. 3d 627, 630-31, 634 (¶¶11-12, 20) (Miss. 2021). Instead, there should be only one burden of proof, regardless of whether evidence is direct or circumstantial: "Jurors should not be concerned about whether evidence is 'direct evidence' or 'circumstantial evidence.' They should consider and weigh all of the evidence presented. And 'if the jury is convinced beyond a reasonable doubt, we can require no more.'" *Id.* at 634 (¶20) (quoting *Holland v. United States*, 348 U.S. 121, 141 (1954)). The jury at Sherry's trial was instructed to require the State to prove each essential element of the crimes charged beyond a reasonable doubt. Since a circumstantial evidence jury instruction requiring an additional burden of proof is no longer required, this issue is without merit.

¶37. Despite the Mississippi Supreme Court's decision in *Nevels*, Sherry still cannot establish that her attorney was constitutionally ineffective for failing to request a circumstantial evidence jury instruction. To note, ineffective-assistance-of-counsel claims are generally reserved for post-conviction relief proceedings. *Ross v. State*, 288 So. 3d 317, 324 (¶29) (Miss. 2020) (quoting *Bell v. State*, 202 So. 3d 1239, 1242 (¶12) (Miss. 2016)). Claims of ineffective assistance of counsel will be addressed on direct appeal when "[(1)] the record affirmatively shows ineffectiveness of constitutional dimensions, or [(2)] the

parties stipulate that the record is adequate and the Court determines that the finding of fact by a trial judge able to consider the demeanor of the witnesses, etc., are not needed." *Id.* These claims may also be reviewed on direct appeal when the record "affirmatively shows that the claims are without merit." *Id.* After a review of the record, this Court finds the record is sufficient to decide Sherry's claim because Sherry cannot show any alleged deficient performance that prejudiced her defense.

¶38.    A defendant must satisfy a two-pronged test established in *Strickland v. Washington* to have a successful ineffective assistance of counsel claim. To prove ineffective assistance of counsel, Sherry must show (1) her counsel's performance was deficient, and (2) the deficient performance prejudiced her defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There is a strong, rebuttable presumption that counsel's performance was effective. *Gilley v. State*, 748 So. 2d 123, 129 (¶20) (Miss. 1999). The defendant must defeat the presumption that under similar circumstances, the challenged action may be considered trial strategy. *Quinn v. State*, 191 So. 3d 1227, 1234 (¶27) (Miss. 2016). The defendant must also show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gilley*, 748 So. 2d at 129 (¶20) (quoting *Strickland*, 466 U.S. at 694). If the defendant cannot satisfy both prongs of *Strickland*, her claim for ineffective assistance of counsel will fail.

¶39.    The first prong of *Strickland* requires a showing that Sherry's counsel was deficient for failing to request a circumstantial evidence jury instruction. A circumstantial-evidence jury instruction was formerly required before *Nevels* to be requested by counsel when the

18

evidence presented by the State was wholly circumstantial, which means there were no eyewitnesses and no confession.[13] The State in Sherry's trial presented eyewitness testimony from Anne, Mary, Susan, and Jane. Each child testified about seeing Sherry watch John sexually abuse children, including themselves, at the daycare. Sherry's criminal trial had direct evidence.

¶40. Jane witnessed John sexually abuse Anne and Katie. Jane testified that Sherry would watch from the kitchen table as John put his tongue in Anne's and Katie's mouths. Jane described the kisses she and Sherry saw as "like making out." During her forensic interview with Emily Thomas, Anne stated that Sherry "saw [John] do these things," and she could not understand why Sherry "did not stop [John] from doing those things." Anne also told Emily Thomas that Sherry would be "sitting right there" when the abuse would occur. Susan told Paige Mormon that Sherry watched John kiss her (Susan) and Katie. Susan testified that when John kissed her and put his tongue in her mouth, Sherry was sitting "inches" away, watching television. Mary told her forensic interviewer and testified that Sherry turned around and smiled at her when John digitally penetrated her. Mary also said that she saw Sherry watching. Even Sherry stated that she saw John kiss Anne and watched Anne wipe the kiss away, which is what prompted Sherry to tell John to stop kissing the children at the daycare. Finally, Sherry would call girls from the back of her house to come "get love" from John.

¶41. The State presented numerous eyewitness testimonies to prove that Sherry knew about

---

[13] *See Nevels*, 325 So. 3d at 642 (¶44) (Kitchens, P.J., dissenting).

the sexual abuse and did nothing to stop it. The evidence presented by the State was not wholly circumstantial. Therefore, Sherry's counsel was not required to request a circumstantial evidence jury instruction under the law at the time this case was tried, and her claim for ineffective assistance of counsel fails the first prong of *Strickland*.

## CONCLUSION

¶42. After review, this Court finds that there was sufficient evidence presented by the State to convict Sherry on all four counts. This Court also finds that Sherry received effective assistance of counsel. Accordingly, we affirm Sherry's convictions.

¶43. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, McCARTY AND SMITH, JJ., CONCUR. EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**